**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| CHARLES OKUBO, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | Case No. 16-cv-7758 | |
| v. | ) | | |
| | ) | Judge Robert M. Dow, Jr. | |
| NANCY BERRYHILL, Acting | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff Charles Okubo's motion for summary judgment [10] and Defendant Nancy Berryhill's cross-motion for summary judgment [17] regarding the Social Security Administration Commissioner's decision to deny Plaintiff's application for disability insurance benefits. Plaintiff asks the Court to reverse that decision and remand the case for further proceedings. For the reasons set forth below, Plaintiff's motion [10] is granted in part, Defendant's cross motion [17] is denied, and the Court remands this case for further proceedings consistent with this opinion.

## I. Background

### A. Procedural History

Plaintiff Charles Okubo applied for disability insurance benefits on July 2, 2013, alleging that he became disabled on April 23, 2013. [Administrative Record ("AR"), at 21.] His application was denied initially on October 15, 2013, and upon reconsideration on April 11, 2014. *Id.* Plaintiff then filed a written request for a hearing with an Administrative Law Judge ("ALJ") from the Social Security Administration ("SSA"). *Id.* This hearing was held on April

15, 2015. *Id.* Plaintiff appeared and testified at this hearing and was represented by counsel. *Id.* A vocational expert ("VE"), Gary Paul Wilhelm, testified as well. *Id.*

On May 11, 2015, the ALJ issued a written decision denying Plaintiff's application on the grounds that he was not disabled. [AR, at 21–29.] Plaintiff appealed the ALJ's decision to the SSA's Appeals Council, arguing that the ALJ had failed to weigh the medical opinions of Plaintiff's treating physicians properly and incorrectly found that there were other jobs that he could perform. *Id.* at 229–231. On May 26, 2016, the Appeals Council denied Plaintiff's appeal, *id.* at 1–6, making the ALJ's decision the final decision of the SSA Commissioner. 20 C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Following that decision, Plaintiff filed suit in this Court. [See 1.]

### B. Factual Background

Plaintiff was born on July 30, 1953. [AR, at 225.] He was roughly fifty-nine years and nine months old on his alleged disability onset date of April 23, 2013. *Id.* Plaintiff has a high school education, *id.* at 196, and last worked as an assistant manager for the produce department in a grocery store, *id.* at 37. In that job, Plaintiff was a jack of all trades. He was responsible for writing schedules, placing orders, hanging sales information, breaking down loads for the store, and taking out garbage. *Id.* at 37–38. Over the course of a day, the store would unload approximately 10,000 pounds of products and trash. *Id.* at 38. Plaintiff estimated that each day on average he would spend about 1.5 hours stooping (bending down and forward at the waist), 7 hours handling large objects, 8 hours reaching, and 30 minutes writing, typing, or handling small objects. *Id.* at 197. In other words, Plaintiff spent the vast majority of his day undertaking some form of physical exertion and very little time on clerical tasks. Plaintiff felt he was bending "almost all the time" during this job. *Id.* at 55. One responsibility that Plaintiff did not have in

his job was the authority to hire or fire other employees. *Id.* at 37. Plaintiff does not have any computer skills, which apparently were not a job requirement. *Id.* at 51.

On April 22, 2013, Plaintiff lifted a garbage can at work that was filed with cut fruit. [AR, at 38–39.] The next morning, he woke up with "foggy vision" and a "black line floating" in his line of vision, and he was diagnosed with several eye problems. *Id.* at 244. In his right eye, he was diagnosed with vitreous floaters (specks of gel floating in eye fluid), vitreous hemorrhage (blood leaking into the eye humor), and retinal detachment. *Id.* He also had hypertensive retinopathy (retina damage from high blood pressure) in both eyes. *Id.* at 245. The store later found that another garbage can containing cut fruit weighed 380 pounds. *Id.* at 39.

Plaintiff saw ophthalmologist Dr. Srilakshmi Maguluri on April 23, 2013, and she instructed Plaintiff to stop working, keep his head elevated (including while sleeping), not bend at the waist, and not lift anything greater than 10 to 20 pounds until instructed further. [AR, at 341.] In May 2013, Plaintiff had surgery to repair his retinal detachment. *Id.* at 240–41. Plaintiff had several follow-up appointments with Dr. Maguluri through the summer of 2013 (*id.* at 232–35, 262–63, 318–19) and these restrictions largely remained in place. *Id.* at 349. Plaintiff then had cataract surgery in October 2013, and was advised by one of Dr. Maguluri's colleagues, Dr. Vandana Badlani (another ophthalmologist), not to lift, strain, or bend at all. *Id.* at 251–52. In January and May 2014, it was still Dr. Maguluri's opinion that Plaintiff "could not work due to weight restrictions" and had to "keep his head elevated, not lift anything greater than 10 pounds, and not bend at the waist." *Id.* at 256, 321.[1]

In January 2014, Plaintiff met with Dr. Badlani to check the fluid pressure in his eye. [AR, at 249.] She noted that Plaintiff was still at risk of retinal detachment and he should immediately notify her or Dr. Maguluri if he noticed "floaters, flashes, or curtain coming down

---

[1] The record also includes a letter from Dr. Maguluri dated October 27, 2015, with these same limitations.

vision." *Id.* She also noted that Plaintiff continued to have hypertensive retinopathy. *Id.* In addition, Dr. Badlani noted that Plaintiff had good vision in both eyes following surgery. *Id.* A consultative examination in March 2014 with Dr. Krishan Nagpal-Agora found that Plaintiff's right eye showed scarring due to the retinal detachment repair, he suffered from diabetes, hypertension, and poorly controlled glaucoma, and there was a slightly increased risk of retinal detachment with "heavy weight lifting," which he considered greater than 50 pounds. *Id.* at 360.

Plaintiff also met with two medical consultants as part of his disability evaluation: Dr. Charles Kenney and Dr. David Mack. On October 3, 2013, Dr. Kenney concurred that Plaintiff had a rental detachment and vitreous hemorrhage. [AR, at 92.] However, he concluded that Plaintiff could occasionally (up to a third of the day) lift 20 pounds, climb ramps or stairs, stoop, kneel, crouch, and crawl. *Id.* at 93–94. He also concluded that Plaintiff could still perform his past work as a produce clerk. *Id.* at 96. On April 4, 2014, Dr. Mack reconsidered this evaluation, which also now reflected the fact that Plaintiff had cataract surgery and that Plaintiff had been told not to lift anything over ten pounds. *Id.* at 100. He concluded that Plaintiff's statements about the "intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." *Id.* at 102. Nevertheless, Dr. Mack concluded that Plaintiff could occasionally lift 20 pounds, climb ramps or stairs, stoop, kneel, crouch, and crawl, and could perform his past work as a produce clerk. *Id.* at 103, 105.

### C.    Hearing Before the ALJ

After Plaintiff's application was denied in October 2013 [AR, at 90], and again upon reconsideration in April 2014 (*id.* at 98), Plaintiff requested a hearing before an ALJ (*id.* at 119), which took place on April 21, 2015. Plaintiff testified at the hearing about his current medical conditions. Plaintiff indicated that he was recently diagnosed with glaucoma for the first time in

his left eye and would be returning to the doctor in two weeks. *Id.* at 41. He also stated that his vision had become slightly worse since his last physician visit. *Id.* at 41–42. He experiences pain in his right eye when he watches television and gets a headache from reading after half an hour. *Id.* at 50–51. He also experiences pain "every other day" lasting for no more than twenty minutes, which he specified he had been having for "just a couple of months" and was returning to the doctor for this reason. *Id.* at 52–53. Plaintiff testified that he consistently takes his eye, blood pressure, and diabetes medications. *Id.* at 51.

Plaintiff testified about his physical activities. He no longer drives a car. He carried only a "little book bag" on a recent airplane trip. *Id.* at 42–48. Regarding chores, Plaintiff testified that he sorts laundry on his knees rather than bend over. He stated that bending over could cause his eye to "pop" and his physician told him that "if it pops, there's no second chance." *Id.* at 48. The ALJ responded, "So you can kind of kneel down or bend – you just can't bend from the waist to put your head lower, but you can, you know, sit on the floor, bend or kneel." *Id.* at 53. As Plaintiff started to answer, the ALJ interjected, "Right. The head can't go down but the legs can go down," and Plaintiff agreed. *Id.* Otherwise, the only other chore he performs is walking the dog. *Id.* at 49–50. Plaintiff testified that his physician's weightlifting restriction was "permanent." *Id.* at 54. He reiterated that his physician was concerned that if his retina detached again, he would lose his eyesight in that eye. *Id.* Otherwise, Plaintiff agreed that he could sit or stand for a "couple of hours" and could walk about a mile. *Id.* at 54.

The ALJ also heard testimony from the VE. The VE opined that Plaintiff's past work is categorized as a produce department manager, corresponding to Dictionary of Occupational Titles ("DOT") code 299.137-010, which is a Specific Vocational Preparation ("SVP") of 7 and a physical demand of medium. [AR, at 58.] This position is defined in the DOT as:

Supervises and coordinates activities of workers in department of retail store: Interviews job applicants and evaluates worker performance to recommend personnel actions such as hiring, retention, promotion, transfer or dismissal of workers. Assigns duties to workers and schedules break periods, work hours, and vacations. Trains workers in store policies, department procedures, and job duties. Orders merchandise, supplies, and equipment. Records delivery of merchandise, compares record with merchandise ordered, and reports discrepancies to control costs and maintain correct inventory levels. Inspects merchandise to ensure it is correctly priced and displayed. Recommends additions to or deletions of merchandise to be sold in department. Prepares sales and inventory reports. Listens to customer complaints, examines returned merchandise, and resolves problems to restore and promote good public relations. May assist sales workers in completing difficult sales. May sell merchandise. May approve checks written for payment of merchandise purchased in department. May install and remove department cash-register-receipt tape and audit cash receipts. May perform customer service activities and be designated Customer Service Manager (retail trade). May plan department layout or merchandise or advertising display * * *.

DOT, Manager, Department (retail trade), 299.137-010, available at

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02D.HTM (last visited May 9,

2018). The VE also acknowledged that as Plaintiff actually performed this position, it would

impose "very heavy" physical demands, rather than just "medium." [AR, at 58–59.]

On cross examination, Plaintiff's attorney asked whether "most" produce department

managers had the power to hire and fire workers. [AR, at 69.] The VE responded, "I'm not sure

about that. I wouldn't say that most, I wouldn't say that. Some may." *Id.* When asked why he

assigned Plaintiff to the produce department manager position rather than a produce clerk (the

position assigned by the medical consultants), the VE explained that Plaintiff's experience

"organizing all of the merchandise, the processing of all the merchandise that comes into the

store, and ordering merchandise for the store" fit this position. *Id.* The VE admitted that he did

not know the actual percentage of time that Plaintiff spent performing this kind of work. *Id.*

The ALJ asked the VE about several hypothetical scenarios. First, the VE was asked to

imagine a hypothetical person with a high school education, age fifty-nine years and six months,

currently approaching retirement age, limited to light work, with "transferability of skills an issue," who is able to occasionally climb ramps or stairs, cannot climb ladders, ropes or scaffolds, can occasionally stoop, kneel, crouch, or crawl, and can only gauge depth perception occasionally because of limited peripheral vision on the right eye. [AR, at 59–60.] The VE agreed that this person could not perform Plaintiff's past work. *Id.* at 60.

Second, the VE was asked to image this same hypothetical person, except he was highly skilled. [AR, at 60.] The ALJ asked whether this person would have transferable skills to another job. The VE responded that a "light manager's job" might be possible, but workers in those positions typically have to be "multifunctional" in a multi-department store and need "to be able to shift to other departments and do other kinds of jobs." *Id.* The VE testified that the skills that would transfer over in this scenario would be "scheduling, organizing, customer service, operations," which were all skills that the VE opined Plaintiff had acquired in his past job. *Id.* at 61. The VE also opined that this hypothetical individual could do the job of "food assembler," "customer service representative," and "production planning and expediting clerk." *Id.* at 62.

The DOT defines the "food assembler" position, which is a light position with a SVP of 3, as follows:

> Prepares meal trays in commissary kitchen for inflight service of airlines, multiunit restaurant chains, industrial caterers, or educational, and similar institutions, performing any combination of following duties: Reads charts to determine amount and kind of foods and supplies to be packaged. Fills individual serving cartons with portions of various foods and condiments, such as cream, jams, and sauces, by hand or using automatic filling machine. Portions and garnishes hot cooked foods, such as meat and vegetables, into individual serving dishes. Stores dishes of hot food on shelves of portable electric warming cabinet or food cart for stowing aboard airplane or transfer to restaurant or cafeteria dining unit. Removes pans of portioned salads, desserts, rolls, cream, and other cold food items from refrigerator or pantry, and places at appropriate stations of tray assembly counter to facilitate loading meal trays. Places food items, silverware, and dishes in depression of compartmented food tray passing on conveyor belt. Examines filled tray for completeness and appearance, and stores

completed trays in refrigerated storage cabinets to be transported to airplane, dining room, or cafeteria.

DOT, Food Assembler, Kitchen (Hotel & Rest.), 319.484-010, available at

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM (last visited May 9, 2018). The VE opined that there are 100,000 of these jobs in the national economy. [AR, at 62.]

The DOT defines the "customer service representative" position, which is a sedentary position with an SVP of 5, as follows:

> Interviews applicants and records interview information into computer for water, gas, electric, telephone, or cable television system service: Talks with customers by phone or in person and receives orders for installation, turn-on, discontinuance, or change in service. Fills out contract forms, determines charges for service requested, collects deposits, prepares change of address records, and issues discontinuance orders, using computer. May solicit sale of new or additional services. May adjust complaints concerning billing or service rendered, referring complaints of service failures, such as low voltage or low pressure, to designated departments for investigation. May visit customers at their place of residence to investigate conditions preventing completion of service-connection orders and to obtain contract and deposit when service is being used without contract. May discuss cable television equipment operation with customer over telephone to explain equipment usage and to troubleshoot equipment problems.

DOT, Customer Service Representative, 239.362-014, available at

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02B.HTM (last visited May 9, 2018). The VE opined that there are 800,000 of these jobs in the national economy. [AR, at 62.]

The DOT defines the "production planner" position, which is a light position with an SVP of 7, as follows:

> Plans and prepares production schedules for manufacture of industrial or commercial products: Draws up master schedule to establish sequence and lead time of each operation to meet shipping dates according to sales forecasts or customer orders. Analyzes production specifications and plant capacity data and performs mathematical calculations to determine manufacturing processes, tools, and human resource requirements. Plans and schedules workflow for each department and operation according to previously established manufacturing sequences and lead times. Plans sequence of fabrication, assembly, installation, and other manufacturing operations for guidance of production workers. Confers with department supervisors to determine status of assigned projects. Expedites

operations that delay schedules and alters schedules to meet unforeseen conditions. Prepares production reports. May prepare lists of required materials, tools, and equipment. May prepare purchase orders to obtain materials, tools, and equipment.

DOT, Production Planner (profess. & kin.), 012.167-050, available at

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01A.HTM (last visited May 9, 2018). The VE opined that there are 71,900 of these jobs in the national economy. [AR, at 62.]

The VE was then pressed on how analogous these positions were to Plaintiff's skill set and potential limitations. He conceded that "some" of these positions "might" require computer skills. [AR, at 63.] When the VE asked whether customer service representatives would be on a computer, the VE acknowledged that this was possible but then offered that "in grocery stores you have people that pretty much do nothing but serve customers," including by checking credit cards. *Id.* When the ALJ followed-up, the VE then agreed that a computer would be required to check a credit card, but then characterized this computer use as "very basic" and could be learned in a month or two. *Id.* at 64. Although he initially resisted describing computer proficiency as a "skill," he then agreed with the ALJ that this was a skill and Plaintiff lacks it, and so "we can't give that job." *Id.* at 64–65. Ultimately, the VE opined that he did not think there was subset of customer service jobs that did not require the computer. *Id.*

Regarding the food assembler job, the VE stated that Plaintiff has all of the skills required to perform this job. [AR, at 65.] The ALJ then asked the VE to imagine the hypothetical individual had reached his 60th birthday, which meant there could "very little, if any, vocational adjustment in terms of tools, work process, work settings, or the industry." *Id.* at 66. The VE originally opined that the food assembler job would meet these criteria. *Id.* He then acknowledged that the work setting for these jobs might differ because this "would be done a lot in facilities such as nursing homes, hospitals, [and] schools." *Id.* at 66–67. The ALJ reminded

him that it needed to be the "same work setting and the same industry," and the VE offered that one option could be a "deli food assembler," which he said fell under the same DOT code for the food assembler position. *Id.* at 67. Although the VE originally opined that there were 100,000 food assembler jobs in the national economy (*id.* at 62), he now opined that there were 430,000 deli food assembler jobs (*id.* at 67).

On cross examination, Plaintiff's attorney asked if a bending limitation would impact a worker's ability to perform a food assembler job. The VE opined, "Well, a food assembler could be done from a sitting position." [AR, at 70.] Plaintiff's attorney asked if the worker "never had to bend at the waist to do that job," and the VE responded, "I'm not saying that. I'm just saying for the most part it can be done from a sitting position." *Id.* The ALJ then interjected that few jobs "really require" bending at the waist, and it could be possible to squat or kneel. *Id.* The VE readily agreed that one could squat or kneel and perform the food assembler job. *Id.* Plaintiff's attorney then performed a physical demonstration, after which the VE conceded that he was bending at the waist "only for a few seconds." *Id.* at 71–72. The ALJ then turned to ask Plaintiff about getting food for customers in a display case, and Plaintiff described that job as requiring "bending" and "reaching." *Id.* at 72–73. He also said, "you don't get to sit down in delis," and you have to "bend over the counter" to give the customer their food. *Id.* at 74. The ALJ then posited that the person assembling the food might not be person "doing the customer service" and interacting with customers, but he did not know if that was true. *Id.* In the end, the VE conceded that food assembly workers in a grocery store "may have to bend" "on occasion," but it would only "be occasional, very occasionally." *Id.* at 75. The VE also rejected that a vision limitation would affect his ability to do this job because he has "one good eye." *Id.* at 70–71.

With respect to the production planner job, the VE stated that Plaintiff possesses all of the skills to perform this work "given his management background." [AR, at 65.] He also opined that this job would not require a change in tools, work processes, work settings, or the industry, and there were 1.2 million of these jobs in the national economy. *Id.* at 67. The ALJ then sought to clarify if there were 1.2 million grocery store production planner jobs in the national economy, and the VE agreed that there were not. *Id.* at 68. The VE was then asked to focus on the same industry, and offered that there were "maybe 50,000" of these jobs nationwide.

On cross-examination, the VE was asked how he arrived at the 50,000 number. He stated, "[j]ust out of 27 years of being in the field of vocational rehabilitation, and working with injured workers or workers that can't do their previous jobs anymore, and some of them have been in grocery stores and whatever." [AR, at 75.] He further explained, "I'm just making a[n] educated guess as to how many of those positions would be in grocery stores." *Id.* at 76.

The ALJ then introduced another scenario regarding the hypothetical worker age fifty-nine years and six months with the same vision and movement limitations but who can lift only ten pounds. [AR, at 80–81.] The VE stated that the food assembler job might require the person to lift more than 10 pounds. *Id.* at 81. In his experience, food trays are "usually under ten pounds, but they could be over ten pounds when you get into meats and stuff like that." *Id.* at 82. The VE also agreed that the food assembler needed to be able to "assemble all kinds of trays." *Id.* at 83. The ALJ then asked if "all of them [would] require [the worker] to lift more than ten pounds." *Id.* at 84. The VE opined "not necessarily," and estimated that 75 percent of food assemblers—75,000 workers nationwide—would assemble food trays only under ten pounds. *Id.* at 84. He also agreed that the ten-pound limitation would have no impact on the number of customer service or the production planner jobs nationwide. *Id.* at 84. The ALJ asked whether

the VE's knowledge of the erosion in job numbers based on weight lifting restrictions was based on experience. *Id.* The VE responded that it was based on his experience and the DOT. *Id.* The ALJ then had to point out the DOT does not distinguish between jobs where 10 pounds and 20 pounds was the maximum, so the VE could not be relying on that for his opinion. *Id.*

Finally, the ALJ modified this ten-pound weight restriction scenario to apply to the hypothetical worker who is over sixty years old. [AR, at 85.] The VE then opined that 50,000 food assemblers worked in grocery stores, *id.* at 86, and 75 percent of them would not need to lift more than 10 pounds, which comes to a total of 37,500 available jobs. Plaintiff's attorney then asked whether all grocery store food assemblers would be required to lift meats, and the VE replied that they would not and he was distinguishing between those that requiring lifting meat (over ten pounds) versus fruits, vegetables, or cheeses (under ten pounds). *Id.* at 87. He also opined based on his observations "as a professional vocational counselor" that a fruit or cheese assembler would "typically not" lift a tray over ten pounds or any boxes. *Id.* at 88. The VE concluded by opining that "stock people" were responsible for lifting boxes onto a table, while the food assemblers would only be required to take the food out of the box. *Id.* at 88.

### D.    The ALJ's Findings

In a written decision, the ALJ denied Plaintiff's application for disability insurance benefits. [See AR, at 21–29.] The ALJ found that Plaintiff had not engaged in substantial gainful employment since his April 23, 2013 disability onset date. *Id.* at 23. She found that Plaintiff had a severe impediment of a detached retina with limited vision in his right eye, but otherwise found his glaucoma to be non-severe. *Id.* To support the latter conclusion, the ALJ relied on Dr. Nagpal's March 2014 consultative examination that the glaucoma was poorly controlled, that Plaintiff's glaucoma would be treated with drops, and the fact that Dr. Maguluri

"did not indicate" in her May 2014 letter "that glaucoma causes any work-related restrictions."
*Id.* The ALJ also concluded that Plaintiff's impairments alone or in combination do not meet or medically do not equal the severity of one of the impairments listed in the appendix to the relevant SSA regulations. *Id.* at 24.

The ALJ next concluded that Plaintiff has the residual functional capacity to perform light work, see 20 C.F.R. § 404.1567(b), "except he cannot lift more than ten pounds," "should never climb ladders, ropes, or scaffolds," "can only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl," "can only gauge depth perception occasionally," and "should not be required to drive a motor vehicle as part of the job." [AR, at 24.] Notably, the ALJ found "the opinion that [Plaintiff] should keep his head elevated and not bend at the waist [to be] too vague for the purposes of this disability evaluation." *Id.* at 26. The ALJ gave "great weight to the non-examining state agency medical consultants' opinions" because they are "highly qualified experts in the evaluation of physical issues in disability claims" and "their findings are consistent with the record as a whole." *Id.* The ALJ gave "little weight" to Dr. Badlani's opinion "after [the cataract] surgery in October 2013" not to "bend, lift or strain" because "[t]hese restrictions are vague" and "they would only apply for the period while [Plaintiff] was recovering from surgery." *Id.* at 26. The ALJ credited Dr. Maguluri's recommendation and Plaintiff's testimony that he should not lift more than ten pounds, but assigned "little weight" to Dr. Nagpal's opinion that Plaintiff should not lift more than 50 pounds. *Id.* The ALJ acknowledge that "not all of [Plaintiff's] alleged symptoms and limitations have been accommodated" because Plaintiff was not "fully credible" at least regarding limitations on his sitting, walking, or standing. *Id.*

Next, the ALJ concluded that Plaintiff could not perform any of his past relevant work as a produce department manager because it was generally performed as very heavy. [AR, at 27.]

However, the ALJ concluded that Plaintiff acquired skills of "scheduling, organizing, customer service, operations, purchasing, and merchandising" in his past work as a produce department manager. *Id.* Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that there were other jobs in significant numbers in the national economy that Plaintiff could perform. Specifically, the ALJ adopted with the VE's conclusions that, while Plaintiff was under 60 years old, he could perform the job of food assembler (75,000 jobs nationally), customer service representative (800,000 jobs nationally), and "production planning supervisor" (71,900 jobs nationally). *Id.* at 28. While Plaintiff was over 60 years old, he could work as a food assembler (37,000 jobs nationally) and production planning supervisor (71,900 jobs nationally). *Id.* The ALJ noted that the "customer service representative position requires computer skills that claimant does not have," but the food assembler and production planning supervisor did not require these skills. *Id.* at 28 n.2. Accordingly, the ALJ concluded that Plaintiff was not disabled. *Id.* at 28.

## II.     Disability Standard

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and related regulations. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must be of such severity that it not only prevents him from doing his previous work, but also prevents him from engaging in any other kind of substantial gainful work which exists in significant numbers in the national economy, considering his age, education, and work experience. *Id.* § 423(d)(2)(A).

Social Security regulations enumerate a five-step inquiry to evaluate whether the claimant is entitled to disability insurance benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step 1, the ALJ determines if the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled, and the claim is denied. If not, the inquiry proceeds to the next step. *Id.* § 404.1520(a)(4)(i). At Step 2, the ALJ determines if the claimant has a severe impairment or combination of impairments that is severe. If not, the claimant is not disabled, and the claim is denied. If so, the inquiry proceeds to the next step. *Id.* § 404.1520(a)(4)(ii). At Step 3, the ALJ determines if the impairment(s) meet or equal a listed impairment in the appendix to the relevant regulations (20 C.F.R. § 404, Subpart P, Appendix 1). If so, the claimant is automatically considered disabled. If not, the inquiry proceeds to the next step. *Id.* § 404.1520(a)(4)(iii). At Step 4, the ALJ determines if the claimant can perform past relevant work, which involves consideration of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). "The RFC must be assessed based on all the relevant evidence in the record." *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). If the ALJ determines that the claimant can perform past relevant work, the claimant is not disabled, and the claim is denied. If not, the inquiry proceeds to the next step. 20 C.F.R. § 404.1520(a)(4)(iv). At Step 5, the ALJ determines whether the claimant can perform other work, given his RFC, age, education, and experience. If so, then the claimant is not disabled, and the claim is denied. If not, then the claimant is disabled. *Id.* § 404.1520(a)(4)(v); accord *id.* § 416.920(a)(4)(i)–(v). The burden of proof is on the claimant for Step 1 through Step 4. *Young*, 362 F.3d at 1000. "If the claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that

the claimant can successfully perform a significant number of jobs that exist in the national economy." *Id.*

### III.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the SSA. 42 U.S.C. § 405(g). "If the Appeals Council denies a request for review, as it did here, the ALJ's decision becomes the final decision of the Commissioner of Social Security." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). An ALJ's decision "must be upheld if it is supported by substantial evidence, which has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (quoting *Pepper v. Colvin*, 712 F.3d 351, 631 (7th Cir. 2013)). "[A]n ALJ must articulate, at a minimum, [her] analysis of the evidence to allow a reviewing court to trace the path of [her] reasoning and be assured that [s]he considered the importance evidence." *Gravina v. Astrue*, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012). The ALJ is not required to address every piece of testimony and evidence in the record, but must "provide some glimpse into the reasoning behind [the] decision to deny benefits." *Id.* Said differently, an ALJ must "build an 'accurate and logical bridge from the evidence to [her] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (citation omitted). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

A court reviews the entire administrative record, but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation and internal quotation marks omitted). The question upon judicial review is not whether the claimant is, in

fact, disabled; even if reasonable minds could differ concerning disability, a reviewing court will affirm so long as the ALJ applied the correct legal standard and substantial evidence supports the decision. See *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## IV.    Analysis

Plaintiff challenges the ALJ's conclusions concerning the RFC, skill transferability, and the VE's testimony. The Court takes each issue in turn.

### A.    Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ's RFC conclusion is flawed for four reasons: it (1) omits the restriction that Plaintiff cannot bend at the waist; (2) improperly ignored Plaintiff's treating physician's medical opinions; (3) failed to consider Plaintiff's glaucoma, high blood pressure, and diabetes; and (4) made erroneous and unsupported conclusions about Plaintiff's credibility. [11, at 6–8, 10–12.] Many of these arguments overlap, and the Court considers them together.

Plaintiff's treating physicians, Dr. Maguluri and Dr. Badlani, determined that Plaintiff should not bend at the waist. The ALJ rejected this recommendation at two points in her opinion. First, she focused on Dr. Badlani's recommendation from October 10, 2013, immediately after Plaintiff's cataract surgery, that Plaintiff should not bend, lift, or strain. [AR, at 26.] The ALJ described these restrictions as "vague" and found that Plaintiff did not "require[] such significant restrictions throughout the period at issue or even for a continuous 12-month period." *Id.* The ALJ further explained that "if these are prohibitions, they would only apply for the period while [Plaintiff] was recovering from surgery." *Id.* Second, while the ALJ credited Dr. Maguluri's opinion that Plaintiff should not lift more than 10 pounds, she found Dr. Maguluri's opinion that Plaintiff "should keep his head elevated and not bend at the waist [to be] too vague for purposes of this disability evaluation," but still included "several postural restrictions" in the RFC. *Id.*

These conclusions are not supported by substantial evidence. Dr. Maguluri initially recommended that Plaintiff stop bending at the waist in April 2013—before his surgery [AR, at 242, 343]. While she also imposed this restriction immediately after surgery in May (*id.* at 237, 239, 241), she continued to recommend that Plaintiff not bend at the waist in June (*id.* at 235), August (*id.* at 323), and September (*id.* at 263). Dr. Badlani then reiterated this restriction after Plaintiff had cataract surgery in October 2013 (*id.* at 252). And Dr. Maguluri reaffirmed this restriction in January 2014 (*id.* at 321) and May 2014 (*id.* at 256). In other words, Plaintiff's treating physicians continuously recommended that Plaintiff not bend at the waist for more than a year and long after each surgery. Plaintiff even submitted to SSA's Appeals Council an October 2015 letter from Dr. Maguluri still imposing these restrictions (*id.* at 377), showing that his physicians' recommendation applied for more than two years. Plaintiff also testified in 2015 that his physician told him that bending would put pressure on his eye and "there's no second chance" if his eye "pops" (*i.e.*, his retina detaches again). *Id.* at 48. To avoid losing his vision, Plaintiff testified that he folds laundry by sitting on his knees. *Id.* All of this evidence is consistent with the conclusion that Plaintiff's no-stooping restriction was durable and permanent.

The ALJ did not articulate why she thought Dr. Maguluri's no-bending restriction was "vague." Stooping recommendations are often part of disability determinations, and the two medical consultants opined that Plaintiff could stoop only occasionally. [AR, at 94, 103.] The fact that these physicians disagreed over the amount that Plaintiff could stoop—"occasionally" versus "never"—does not make the latter recommendation vague. Likewise, the ALJ did not explain why she concluded that Dr. Maguluri's opinion that Plaintiff should not bend at the waist only applied post-surgery, but gave "great weight" to the opinion that Plaintiff should never lift more than 10 pounds. *Id.* at 26. Both restrictions appear in the same letters cited by the ALJ and

are dated months after Plaintiff's surgeries.  *Id.* at 256, 321.  If the ALJ had a reason for crediting one but not the other, it does not appear in her written decision.

"An ALJ may not selectively consider medical reports," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that does not support her conclusion and explain why that evidence was rejected," *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). "[W]here, as here, medical evidence supports the claimant's allegations and the ALJ nevertheless rejects a claimant's testimony as not credible, 'the ALJ cannot merely ignore the claimant's allegations,' and must articulate 'specific reasons' for [her] finding." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal citations omitted).  Asserting without elaboration that a medical recommendation is "vague" when that recommendation is expressed at multiple times in a claimant's medical file by multiple treating physicians, corroborated in part by the state agency medical consultants, and explained by the claimant live at the hearing does not meet this standard.  *Scott*, 297 F.3d at 595.

The same result is required when viewed through the lens of the treating physician rule. "[M]ore weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  The "treating physician" rule "directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(c)(2)).  "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Id.*  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to

consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). "'Th[is] checklist is designed to help the [ALJ] decide how much weight to give the treating physician's evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien*, 439 F.3d at 376).

The ALJ did not explicitly engage in this two-step analysis. The Commissioner does not contend that Drs. Maguluri's stooping limitation is medically unsupported. And Drs. Kenney, Mack, Maguluri, and Badlani all recommended a stooping limitation, although they disagree on the extent of that limitation. Because these medical reports conflicted, the treating physician "presumption falls out and the checklist comes into play." *Bauer*, 532 F.3d at 608. However, the ALJ failed to analyze the record evidence through this checklist or provide a "sound explanation for the rejection" of Dr. Maguluri's recommendation. *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). The failure to do either requires remand. See *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).

In this case, Plaintiff's two treating physicians are both ophthalmologists, they performed his retinal and cataract surgeries, and they examined Plaintiff multiple times over multiple years. In such circumstances, "the checklist required the administrative law judge to give great weight to their evidence unless it was seriously flawed." *Bauer*, 532 F.3d at 608 (reaching the same result where "there were two treating physicians, that they were both specialists in psychiatric disorders, and that they examined the plaintiff over a period of years"). Although the record is silent as to Dr. Kenney's and Dr. Mack's qualifications, neither appears to be an eye specialist. The ALJ states that she relies on their opinions because they are "highly qualified experts in the evaluation of physical issues in disability claims," not because they have any specialization in

treating eye conditions.  [AR, at 26.]  And no one—not Dr. Kenney or Dr. Mack, not the ALJ, and not the Commissioner—can identify why they believe Dr. Maguluri's opinion is wrong or what basis they have for concluding that Plaintiff can spend up to a third of every day bending at the waist without risking blindness in his right eye.  See *Bauer*, 532 F.3d at 608 ("The consultant did not identify a flaw in the treating physicians' analysis, but merely expressed a contrary view after reading the medical files; and it is not even clear whether he has relevant expertise for such a task, since we do not know what his field is.").  That hardly counts as a sufficient basis to give greater weight to the medical consultants' opinions than the treating physicians' opinions.

The Commissioner offers little to justify the ALJ's rejection of this limitation.  She argues that the "[s]tate agency medical consultants are experts in Social Security disability evaluation" and their opinions "support the ALJ's determination that plaintiff could perform occasional stooping."  [18, at 5, 8.]  Those assertions do not provide any more substance than the ALJ's conclusory analysis.  The Commissioner also cites case law that a treating physician's opinion is not necessarily dispositive because "[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  The Commissioner does not explain how that principle applies here or what evidence shows that Plaintiff's ophthalmologists are biased.

In addition, the Commissioner focuses on Dr. Nagpal's opinion, which she argues "did not specify any limitation that would prohibit occasional stooping or crouching at the light exertional level."  *Id.* at 8.  There are two problems with this argument.  First, Dr. Nagpal's opinion had nothing to do with the ALJ's rejection of Dr. Maguluri's stooping opinion.  "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."  *Kastner*, 697 F.3d at 648; accord *Mendez v.*

*Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("In defending the administrative law judge's decision on a ground that he himself did not mention, the government violates the *Chenery* principle."). "The court's review is limited to the reasons articulated in the ALJ's decision, not the post-hoc rationale submitted in the Commissioner's brief." *Murphy v. Colvin*, 2013 WL 6235327, at *2 (N.D. Ill. Dec. 2, 2013) (collecting cases); accord *Mueller v. Astrue*, 493 F. App'x 772, 776 (7th Cir. 2012); *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003). The ALJ does not discuss the absence of stooping limitations in Dr. Nagpal's opinion as the basis for her decision, and the Commissioner cannot assert this argument now as a basis to uphold the ALJ's decision. See, *e.g.*, *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*. Although the ALJ cited the opinions of both psychologists, he did not use either opinion to support his decision to reject [the treating physician's] opinion."). Second, this contention cannot be squared with the ALJ's reasoning because she assigned "little weight" to Dr. Nagpal's opinion and credited Dr. Maguluri's 10-pound limitation over Dr. Nagpal's 50-pound limitation. [AR, at 26.] The Court cannot see how the ALJ implicitly credited Dr. Nagpal's unexpressed opinion that no stooping limitations were required when she explicitly rejected his only express opinion on weightlifting.

In these circumstances, remand is necessary. If the ALJ decides on remand not to give controlling weight to Plaintiff's treating physicians' opinions that he cannot bend at the waist, then the ALJ must proceed to the second step and determine what *specific* weight it should be given by using the checklist. A sufficient explanation of the reasons and evidence relied upon is necessary before this Court can build an accurate and logical bridge from the evidence to the ALJ's conclusion and afford meaningful judicial review to Plaintiff. *Scott*, 297 F.3d at 595.

Before moving on, the Court notes three other issues for possible consideration on remand. Plaintiff asserts that the ALJ "ignor[ed] his recent diagnosis of glaucoma" in his left eye and the "objective evidence of diminished vision in that eye." [11, at 7.] That is not accurate. The ALJ concluded that Plaintiff's glaucoma was a non-severe impediment and explained why. [AR, at 23.] Glaucoma can be a non-severe impediment, see, *e.g.*, *Parker v. Colvin*, 660 F. App'x 478, 483 (7th Cir. 2016), and Plaintiff does not point to any medical evidence in the record suggesting that this condition was severe. Indeed, there was no "objective" record evidence demonstrating Plaintiff's vision had diminished from glaucoma. The only evidence on these issues was Plaintiff's testimony that his vision had decreased, that he was taking presently taking eye drops for treatment, and he would be returning to his doctor for further possible glaucoma treatment. Dr. Nagpal's opinion—which the ALJ rejected—does not specify where glaucoma was found, and none of Dr. Maguluri's letter discuss this diagnosis. In other words, the current record does not support a finding that this condition was severe, what treatment was needed, or whether this condition would have been expected to impair Plaintiff's ability to work. On remand, Plaintiff is free to submit actual evidence supporting this claim and the ALJ is free to reconsider whether Plaintiff's glaucoma would have on impact on Plaintiff's capacity to function at work.

The same is true regarding whether Plaintiff's diabetes and high blood pressure require additional functional limitations. [AR, at 223] Most of these conditions long pre-date the alleged onset of Plaintiff's disability in 2013, and Plaintiff does not make any substantive argument as to how specifically those impairments should impact any aspect of the RFC determination [11, at 8]. He testified that medications for these conditions helped and he does not experience any side effects from them. [AR, at 52.] Nevertheless, blood pressure issues

were a factor in Plaintiff's original retinal detachment [see, e.g., *id.* at 245], and the Court will leave to the ALJ on remand resolution of what additional limitations, if any, may be appropriate.

Plaintiff also challenges the ALJ's finding that Plaintiff was "not fully credible." [See AR, at 26.] The ALJ explained that she reached this conclusion because she did not find "support in the record based on a medically determinable impairment for any restrictions on sitting, standing, or walking." *Id.* It is hard to know what to make of this finding because Plaintiff argues that "those exertional elements are not at issue" [11, at 11]. Indeed, neither the Commissioner nor the ALJ cites any portion of the record where Plaintiff requests these limitations. The ALJ wrote that Plaintiff stated that he is unable to "sit for longer than two hours, stand for longer than two hours, or walk for more than a mile at a time." [AR, at 25.] The ALJ's ambiguous questions to Plaintiff did not directly establish an outer bound of Plaintiff's abilities. *Id.* at 55–56 (Q: "And do you have any problems sitting for a couple of hours. A: No."); *id.* at 56 (Q: "Okay. And you can stand for a couple of hours? A: I guess I could."). The ALJ does not elaborate if there are other topics on which the ALJ found Plaintiff not credible.

To the extent the ALJ meant that Plaintiff's self-reports of eye pain varied over time, she is reminded that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate." SSR 16-3p, 2016 WL 1119029, at *9. "Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time," which can "explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms." *Id.* Plaintiff testified at the 2015 hearing that he had started experiencing pain in his eyes only in the last "couple of months," which was one of the reasons why he was returning to the doctor. [AR, at 53.] The fact that Plaintiff reported a lack of eye pain following surgery in 2013 (*id.* at 25) or reported that his vision was good in

early 2014 (*id.* at 249) does not mandate a finding that his claims about the "intensity, persistence, and limiting effects of these symptoms" in 2015 "are not entirely credible" (*id.* at 25). On remand, the ALJ can revisit whether and how the "entire case record" supports any findings concerning "the intensity, persistence, and limiting effects of [Plaintiff's] symptoms." SR 16-3p, 2016 WL 1119029, at *4.

### B. Transferability Of Plaintiff's Skills

Plaintiff argues that the ALJ erroneously concluded that he has transferable skills. [11, at 8–10.] This argument turns in part on the Commissioner's Medical-Vocational Guidelines or the "Grids." The Grids are "a series of tables broken into separate rules which classif[y] a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (internal quotation marks omitted). Because Plaintiff was fifty-nine years and nine months old on his alleged disability onset date, the ALJ distinguished between the rules that apply when a claimant is of "advanced age" (age 55 or older) and "closely approaching retirement age" (age 60 or older). [AR, at 27–28]; 20 C.F.R. Pt. 404, Subpt. P, App. 2.

For a worker of advanced age with a high-school education and limited to light work, the disability finding turns on whether the worker has transferable skills. If so, the worker is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.07. If not, the worker is disabled. *Id.* § 202.06. The same is true for a worker closely approaching retirement age, but "there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." *Id.* § 202.00(f). The ALJ found that application of each rule to this case results in a different set of alternative representative jobs that Plaintiff could perform. If Plaintiff is considered to fall under age 60, then the ALJ concluded that representative

occupations included food assembler, customer service representative, and production planner. [AR, at 28.] If Plaintiff is considered over age 60, then the ALJ concluded that only the food assembler and production planning supervisor jobs remain. *Id.*

Plaintiff challenges the ALJ's conclusions in two respects: (1) she should have applied the older age category, rather than "mechanistically" distinguishing between them; and (2) Plaintiff lacked the specific transferable skills needed for these other jobs. [11, at 9.] The Court agrees that these issues require remand. The SSA has promulgated regulations to govern application of the age categories "in a borderline situation," explaining "[i]f [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." 20 C.F.R. § 404.1563. Courts have divided over whether the age category determinations require explicit factual findings or are discretionary. See *Figueroa v. Astrue*, 848 F. Supp. 2d 894, 896–900 (N.D. Ill. 2012) (collecting cases). The ALJ here, however, seems to have applied both age categories, which requires remand regardless of the approach ultimately adopted by the Seventh Circuit. Under the former line of cases, remand is needed because the ALJ did not "make an explicit age category determination based on whatever evidence is available" and support his finding with "substantial evidence." *Anderson v. Astrue*, 2011 WL 2416265, at *13 (N.D. Ill. June 13, 2011). Under the latter line of cases, the ALJ failed to exercise her discretion to choose between these categories, and "[i]n all contexts, failure to exercise discretion, however uncanalized that discretion, is, itself, an abuse of discretion." *Figueroa*, 848 F. Supp. 2d at 900. Because Plaintiff was roughly three months from his 60th birthday at the disability onset date, choosing between these age categories and explaining that

choice is necessary for the ALJ to "build a logical bridge between the evidence and their conclusions so as to permit meaningful review." *Pelech v. Colvin*, 2016 WL 727208, at *7 (N.D. Ill. Feb. 22, 2016) (remanding for borderline age analysis).

Contrary to the Commissioner's argument, the borderline age determination is not "immaterial" to Plaintiff's disability finding. [18, at 7.] If Plaintiff is placed in the "closely approaching retirement age" category, there must be "very little" vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(f). The ALJ recognized that this meant customer service job (239.362-014) could not be considered at all.[2] [AR, at 28.] However, it is difficult to see how the "production planner" position (012.167-050) meets this standard either. The VE opined that this position did not involve a change in tools, work processes, work setting, or industry "because [he felt] that [Plaintiff] did all of [these functions] when he was a manager." [AR, at 67.] Not only does that response ignore how many of these jobs are in the same "work setting" and "industry," it is almost impossible to square that opinion with the description of this position in the DOT.

The production planner position is under DOT section "012," which corresponds to "industrial engineering occupations." DOT, Industrial Engineering Occupations, 012, available at https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02B.HTM (last visited May 9, 2018). The topline description of this position is one who "[p]lans and prepares production schedules for *manufacture* of industrial or commercial products." DOT, Production Planner, 012.167-050 (emphasis added). The position is described as involving "[a]nalyz[ing] production

---

[2] There are other problems with this job. Plaintiff testified that his eye hurts after watching television and he can only read for a half hour before getting a headache. [AR, at 50–51.] The ALJ did not ask the VE about whether these limitations might preclude a person from performing a customer service job that requires sitting at a computer for eight hours a day. She also glossed over this testimony in her decision. And although the ALJ acknowledges that Plaintiff lacks computer skills (*id.* at 28 n.2), she never explains how she gets over that hurdle to find that Plaintiff has transferable skills to perform this job. Tellingly, the Commissioner does not try to defend this portion of the ALJ's decision. [See 18, at 6 n.4.]

specifications and plant capacity data and perform[ing] mathematical calculations to determine manufacturing processes"; "schedul[ing] workflow[s] for each department and operation according to previously established manufacturing sequences and lead times"; planning "sequence[s] of fabrication, assembly, installation, and other manufacturing operations"; and "[d]raw[ing] up master schedule[s] to establish sequence and lead time[s] of each operation." *Id.* On its face, the industrial engineering industry is different than the grocery business. In fact, almost *none* of those manufacturing-related duties correspond to working in a grocery store except at an extremely high level of generality. Of course, "scheduling" plays a role in both industries, but it is improbable (at best) that a worker can move seamlessly from coordinating grocery employee work shifts to scheduling workflows for industrial plant manufacturing sequences. Indeed, Plaintiff testified that he does not know how to use a computer and spent at most 30 minutes a day writing in his old job. [AR, at 51, 197.] Nothing in the record shows that Plaintiff's past produce department work means that there would be "very little" vocational adjustment for Plaintiff to start "perform[ing] mathematical calculations to determine manufacturing processes, tools, and human resource requirements" in an industrial plant, DOT, Production Planner, 012.167-050, and the ALJ's contrary conclusion is entirely unsupported.

That leaves the food assembler job (319.484-010). The VE agreed that a food assembly worker in a grocery store might have to bend, even if he acceded only reluctantly that bending would be necessary "very occasionally" [AR, at 75]. If the ALJ decides on remand that the no-bending limitation should be added to the RFC, the food assembler job is not a representative position that could be available to Plaintiff. And if the Commissioner cannot otherwise satisfy her burden at Step 5, Plaintiff will be found disabled. Therefore, the Court agrees this age categorization is a potentially dispositive issue that the ALJ must address on remand.

## C.     The VE's Testimony

Plaintiff contends that the VE's testimony was "inherently unreliable," and thus the Commissioner cannot establish her burden at Step 5.  [11, at 12–13.]  "The Commissioner bears the step-five burden of establishing that the claimant can perform other work that 'exists in significant numbers in the national economy.'"  *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1560(c)(2)).  "A VE's testimony can satisfy this burden only if that testimony is *reliable*.  A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated."  *Id.* (citation and internal quotation marks omitted).

Putting aside the fact that the VE seemed determined to opine that Plaintiff could perform other work [see, *e.g.*, AR, at 63–65, 69–72, 75, 81–87], multiple aspects of the VE's testimony were in direct conflict.  Let's focus on his opinions about the "food assembler" position.

According to the DOT, this position's full title is "Food Assembler, Kitchen (Hotel & Restaurant)" and relates to "prepar[ing] meal trays in commissary kitchen for inflight service of airlines, multiunit restaurant chains, industrial caterers, or educational, and similar institutions." DOT, Food Assembler, 319.484-010.  The VE opined that there are 100,000 of these positions in the national economy.  [AR, at 62.]  Although the industries described in this food preparation "Hotel and Restaurant" kitchen DOT code are the airline, restaurant, industrial caterer, college, nursing home, and hospital industries, the VE nevertheless opined that "430,000" "deli food assembler jobs" in grocery stores fall under this code.  *Id.* at 67.  The VE also opined that deli food assemblers can work "for the most part" from a seated position, even though Plaintiff—who has worked in a grocery store—testified that "you don't get to sit down in delis."  *Id.* at 70, 74.

Likewise, although the VE agreed that food assemblers were required to assemble "all kinds of trays" (*id.* at 82), he then opined that *75 percent* of food assemblers would never be required to lift more than ten pounds (*id.* at 84)—a statistic that he seems to have pulled from thin air.[3]  He then reverted to using the 100,000 estimate and concluded that 75,000 food assemblers would never lift more than ten pounds.  *Id.* at 84.  Minutes later, the VE opined that there were actually 50,000 grocery store food assembler jobs, and 75 percent of these jobs (or 37,500 jobs) did not require lifting more than 10 pounds.  *Id.* at 85–87.[4]  There is "[n]othing in the record [that] enables us to verify those numbers."  *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014).  And the fact that the VE could not keep straight how many grocery store food assembler jobs exist in the national economy is a good indication that his "expert" testimony on this subject is not reliable.

In differentiating which grocery store food assembly jobs required lifting more than 10 pounds, the VE distinguished lighter jobs involving "fruit" from heavier jobs "meat."  *Id.* at 87.  The VE seemingly overlooked that this very Plaintiff injured himself lifting fruit.  *Id.* at 38–39.  In fact, Plaintiff had submitted statements that his grocery store "usually g[o]t about 30 to 50 bins of watermelons in the summertime" and "watermelons can weigh more than 10 pounds easily."  *Id.* at 202.  The VE also insisted that food assemblers would never lift boxes of food onto tables, insisting that only "stock people" do that.  *Id.* at 88.  Yet the DOT food assembler description notes that this job involves "[r]emov[ing] pans of portioned salads, desserts, rolls, cream, and other cold food items from refrigerator or pantry, and plac[ing them] at appropriate stations of tray assembly counter to facilitate loading meal trays."  DOT, Food Assembler,

---

[3] There were similar problems with the VE's other opinions, such as his conclusion that 50,000 of the 71,900 jobs under DOT Code 012.167-050 (that is, production planners involved in the manufacture of industrial or commercial products) were in the grocery store industry.  [AR, 68, 75.]

[4] The 50,000 figure was likely mixed up with the grocery store retail managers figure.  [AR, at 68.]

319.484-010.  Said differently, it is the VE's opinion that grocery store food assemblers are responsible for lifting pans of fruit or other "cold food items" out of a refrigerator and placing them on the counter for assembly, but if this fruit is on the floor in a box, this becomes someone else's job.  For all of these counter-intuitive opinions, the ALJ relied solely on his "experience." [See, *e.g.*, AR at 75.]  "At a minimum, a vocational expert relying on personal experience, without any citation of objective reports or documents, must provide some specificity concerning the facts, figures, or other data that form the basis of his testimony."  *Smith v. Astrue*, 2010 WL 3526665, at *17 (N.D. Ill. Sept. 1, 2010).  The VE never comes close to doing so.

Yet the ALJ did not address *any* of these obvious problems with the VE's testimony in her decision.  She simply adopted the VE's conclusions.  [AR, at 28.]  But "[e]vidence is not 'substantial' if vital testimony has been conjured out of whole cloth."  *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).  Nor is an ALJ required to suspend common sense and accept a VE's unsubstantiated speculation.  See *McKinnie v. Barnhart*, 368 F.3d 907, 910–11 (7th Cir. 2004).  Indeed, "an ALJ has an 'affirmative responsibility' to ask whether a vocational expert's evidence 'conflicts with information provided in the DOT' before relying on that evidence to support a determination of nondisability."  *Overman*, 546 F.3d at 462–63 (citation omitted).  In light of the many conflicts in VE's testimony and between his testimony and the DOT, the ALJ's failure to address or resolve these conflicts and her dependence on this unreliable VE testimony means that the Step 5 conclusion was unsupported by substantial evidence.  *Overman*, 546 F.3d at 463.  On remand, the ALJ should take care in assessing the reliability of any VE testimony.

In addition to these problems, Plaintiff challenges the ALJ's conclusion that the VE's testimony was "consistent with the information contained in the [DOT]" and the VE "explained that his testimony as to the number of available jobs as well as to the issues surrounding

transferability of skills are based on his experience and observation." [AR, at 28.] The Seventh Circuit has explained that "the DOT does not contain information on which to base an estimate of the number of available jobs of a particular kind." *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); accord *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) ("We also have no idea what the source or accuracy of the number of jobs that vocational experts (including the one in this case, whose estimates the administrative law judge accepted without comment) claim the plaintiff could perform that exist in the plaintiff's area, the region, or the nation."). The Seventh Circuit has also explained that "the vocational expert is required to estimate the number of jobs in the applicant's locality and region, as well as in the nation as a whole, that the applicant for benefits can perform." *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014). The VE did not do that here (although Plaintiff did not object at the time), and the failure to do so can be harmless because "if there is a substantial number of such jobs in the nation, the applicant's claim fails, no matter how few there are in his locality or region." *Id.* However, the ALJ should consider on remand whether these alleged deficiencies require further explanation or support in any future decision regarding Plaintiff.

## V.     Conclusion

For the foregoing reasons, Plaintiff's motion [10] is granted in part, Defendant's cross motion [17] is denied, and the Court remands this case for additional proceedings consistent with this opinion.

Dated: May 9, 2018

_____
Robert M. Dow, Jr.
United States District Judge